Huzzack. Adam Clerk. 16-2471, Illinois Collaboration on Youth at All v. James Dimas at All. The attorneys that are going to present oral arguments would step up and please identify yourselves for the record. I'm Tom Gagin. I'm representing the Pellon plaintiffs. Mr. Gagin. Assistant Attorney General Richard Huzzack, counsel for the defendants' attorneys. Mr. Huzzack. Good morning to you both. Each of you will have approximately 15 minutes to present your argument and from that you may save out some time for rebuttal. Good morning. Good morning. I am Tom Gagin on behalf of the plaintiff appellants and we represent a variety of organizations, Heartland Alliance, Knight Ministry, Children's Aid, New Moms, 61 organizations that provide the network for providing human services in the state to the most vulnerable people in the state, homeless youth, rape victims, senior citizens in assisted living. Mr. Gagin, I think we're all in agreement that your clients all deserve to be paid and do a very meritorious service. We all agree on that. The question is, aren't you just trying to do a run and run around sovereign immunity by asking for perspective relief on this? I'm not sure how we get around that. Well, this is an ultra-virus act by the governor, so that act, acting ultra-virus, strips the governor of sovereign immunity. Because there are officers exceptions, but how do you get that he doesn't have the authority to veto any budget? Or how do we have the authority to tell him he doesn't have the authority to do it? Of course he has the authority to veto the budget, but that veto strips him of his authority as an executive to continue these contracts for which he has brought the funding. He exceeds the power of his office as an executive, not in his legislative role, but once he uses that legislative power, that legislative veto to block the funding of contracts that he himself entered, that veto strips him of his authority as an executive to continue those contracts without payment. And that's especially true when, in effect, these plaintiffs can't withdraw from these contracts, literally because of the 30-day rule they have to continue, but also because they risk nonpayment, as the state itself concedes in this brief. The state doesn't dispute that the plaintiffs really cannot easily get out of these contracts. So this is really unconscionable behavior, but it's also illegal because the veto strips him of that authority. From that point on, as an executive, not in his legislative capacity, but as an executive, he is acting ultra-various by continuing these contracts, holding plaintiffs to them when there is no ability of these plaintiffs easily or practically to get out of these contracts. Well, when you say that when he exercises the veto, that he is then stripped of his power, what do you mean? I mean that, at that point, he has disaffirmed contracts that he has entered as an executive. The governor and the department heads have entered contracts for which they have blocked the funding, and by their own act, by their own act, they have ensured that there will be no money for these contracts that they're continuing. In our view, that's ultra-various act, if not unconscionable, and the reality is that this kind of conduct by a private business would constitute not just breach of contract, an unfair trade practice. It's just against the public policy of the state. It's against fairness and equity for the governor to use his veto power to block the funding of these contracts and then, as an executive, purport to continue these contracts. But can we really compare it to private conduct? Is there really some kind of similarity? It's worse. Well, in terms of a private contractor doesn't have the veto power, that person isn't the governor with the constitutional powers that the governor has. So how do we really compare it to that situation? Well, because in the case of an unfair trade practice, we look at three prongs, any one of which constitutes an unfair trade practice under Robinson v. Toyota. One is public policy. Well, it's certainly against the public policy of the state for the state to operate and claim the right to walk away from all of its obligations just because the governor has vetoed the funding of the contracts. The contract that your plaintiff signed with the state, did the state have that ability? The contract specifically says, this is how a contingency plan can get an appropriation. So once your client signs those contracts, aren't they bound by the terms of that contract? Of course they're bound by the terms of it. And the contingency clause in section 4.1 is just the premise for giving the governor the right to terminate the contracts. The Also, doesn't it also, though, permit his actions because the contract says that unless this contingency of the appropriations is met, isn't that in the contract? That's in the contract. And the rest of the contract says, therefore, and accordingly, he may terminate the contracts. But what he can't do is continue those contracts when by his own act, he's taken away the money to fund them. That's an act of, that's an abuse of his authority as an executive. And it's very important to keep in mind that the plaintiffs cannot easily withdraw from these contracts. So, and the governor has no interest, and the department heads have no interest in terminating them. Why? Because if they terminated them, the infrastructure of the state for providing human services would collapse. And far better to have these not-for-profit charities fund the state, effectively afloat the state during this budget crisis while they're being used as political hostages, which is also inequitable and unconscionable. And second, if they terminated these programs, suppose they shut down the senior assisted living or the redeploy Illinois, the juvenile diversion program. That means the state has to take in the seniors into a nursing home and pay more money. It has to put the kids into jails or detention centers of one kind or another. So they're not about to shut down these programs. And they're happy to have the plaintiffs go on and suffer these lines of credits, the pay goes for the senior executives, layoff staff, all because these plaintiffs cannot easily withdraw from them. Is there a case, though, that you would compare to this that you think best supports your position where we have an executive of the state and then we have the legislature who's appropriations, legislating the appropriations. Is there a case that you would think that would best support your position so that if we were to write this to go along with your suggested ruling? There are four cases. All right. Let's start with LitaRow, which strips the dependent state from sovereign immunity. That was just the fact that the university wasn't following certain of its own procedures for investigating a research grant. Or take Senn Park, the director of the Department of Public Aid, just miscalculated the cost of living increase. Those were legal acts that stripped those state officials from sovereign immunity. By comparison, in this case, those acts were trivial. And two more cases. One is certainly ASME versus NETCH, the fourth district decision back when the budget crisis arose the last time. And there the appellate court said, look, we're not going to require the state to pay money to the ASME people right now, but if this continues, if there is a breakdown in government, we're not going to sit by idly and do nothing. And that was an invitation back then and a warning to the two branches that you can't operate this state without paying people. And the final case is the Supreme Court decision last year in ASME, state CMS versus ASME. By the end of that opinion, the court is almost entirely relying upon Section 21 of the Public Labor Relations Act as a reason for not appropriating it. But the real difference between those two cases is that there was, the government was operating normally back then. Now there has been a breakdown in government. And if you read the opinion, there is twice in the majority opinion at the very end, there are statements that clarify that, look, if there is a breakdown in government, if the state is coming and saying it's going to walk away from all these obligations, don't rely upon this opinion because we're going to take a different look at this. So you have two invitations from appellate courts to say this is unconscionable, it's this kind of breakdown. And we have had a breakdown. We are about to celebrate the second anniversary of no budget for almost two fiscal years now, which Article 8 requires to be in place. It is not appropriate for Article 8 at this point, as it might have been in state CMS versus ASME, to be raised as defense, when there is no budget in place, there's been no spending plan from the state, there's been no calculation by the General Assembly about what should be in and what shouldn't be in. And that gets to the impairment issue. I would say that the leading case there is U.S. Trust Company versus New Jersey. It's cited as the U.S. Supreme Court case on Article 1, Section 10, which is the analog of Article 1, Section 16. In that case, the mere fact that the state of New Jersey took money out of one account from the bondholders to put it into another account for mass transit, and nobody lost anything, the bondholders hadn't lost a dime, so rendered the contract less secure of payment that it was an impairment of contract and it was a violation of Article 1, Section 10 of the U.S. Constitution, which we have the analog here. We submit respectfully that compared to that case, the failure to have a budget here is colossally destabilizing the security of all the contracts of the state. Does the fact that the legislature passed and the governor signed a specific appropriations bill for 2016, does that change your argument at all? Yes, because it leads to another impairment of contract. You know, it aggravates the political hostages, and that's the reality here. Everybody agrees that we should be paid. The governor agrees, the legislature, they all issue these statements. Oh, it's all so tragic. The only reason we're not being paid is because we're being held as political hostages for unrelated reasons in a budget battle. Everyone knows that these sums are due. This isn't like the state CMS versus AFSCME case last year where you had the governor and the legislative branch saying AFSCME shouldn't get the pay raise. Everybody would come up and say, oh, yes, yes, of course they should be paid. And why not? Because we're being held political hostage. And the stopgap is one way of continuing the hostage situation. You know, if you look at the stopgap, they're saying, well, we'll give you partial payments to keep you going. In other words, you know, we don't want you to die, but we want you to continue to have a lot of injury. And we want you to continue to be in pain because that, you know, keeps up the political pressure to cut a deal. That is immoral, but it's also the impairment of contract because they're accepting the contract. The general assembly accepted the contracts for 2016 and 2017. Oh, yes, they're fine. They're fine. We accept them. We accept them. But we're just going to write down the face value of them. That is a breach of the impairment of contracts. And it's a breach because, first of all, it's just it purports to accept contracts and then change the terms of them. But it's also a breach because the fact that they don't appropriate the money for them means that we have no legal remedy for nonpayment in the Court of Claims. And it's the fact that that stopgap bill, cutting down the appropriations, and the way the state laws are set up, and here I'm referring to the State Lawsuit Immunity Act and the Court of Claims Act, means that there's no legal remedy for nonpayment in the Court of Claims. The Court of Claims will not pay any money unless there's an appropriation. So that leads to the fact that the only So you have no standing, then, in the Court of Claims to bring this? Oh, we have standing. They just have a policy of not paying. When there aren't any appropriations? When there aren't any appropriations. It's not a court. It's really a kind of committee of the legislature. So it's What's not a court? Well, the Court of Claims is only an administrative body. I didn't mean for you to say that. It's not a court in the sense that this is a court. Well, it's not an independent part of the judicial branch. It's really part of the legislative branch. And if the money isn't there, they will not give relief. So we have either no remedy or we have an impaired remedy in the Court of Claims. And it's important to emphasize you don't have to have a total destruction of the right under Article I, Section 16. That's what U.S. Trust says about Article I, Section 10. A partial destruction, a partial impairment is still an impairment. And we have no effective, likely, probable remedy in the Court of Claims. If we could back up to the Court of Claims for one second. Nobody is disputing the amounts due, correct? No. So wouldn't the Court of Claims function just to be a determination of what was due? So is that another reason why the Court of Claims couldn't give you the relief you're seeking because you already have a determination of what's due? Well, first of all, there might be a dispute about what is due. I shouldn't have answered that so presumptuously. But let's assume there is no dispute. The Court of Claims just has and we cite cases where they say we're not going to pay anything because we have a policy of not paying anything unless it's been appropriated. But that wouldn't be a determination that you're not due that amount of money, correct? It would just be saying there's no pot to pay you from, so sorry, there's nothing there. Okay. Well, I don't think that the Court of Claims would get to the issue of determining what is due and what is not due if there's no power to give relief. Why would a court give an advisory opinion like that? Well, I would differ with you on that. If the action had brought in the Court of Claims, even though there's not appropriations which could support the payment of those claims, I don't think that the Court would be giving an advisory opinion to determine an amount due and owing. And I don't think there's anything that you cited that would even suggest that. All you said is that because there are no appropriations, they won't pay, but that doesn't mean they couldn't enter a judgment in favor of the plaintiffs. Justice McBride, that is an impairment of the legal remedy. What are you saying? Your point is it's not a complete destruction of it. I would stipulate that that's not a complete destruction, but it's a serious impairment from a common-sense point of view and from a legal point of view. What litigant wants to go through four years, as some of these cases in the Court of Claims takes, for a judgment at the end saying, we'll do the money, but it's not going to come out of, we can't pay you anything because there wasn't any appropriation. I don't think that the Court would actually render a judgment that we'll even do the money. And in any case, it's unenforceable. So you're left without money. You know, it's, this is the classic case. It's unenforceable even for, if we said, yes, you'll do the money, the state has to pay you the money. It's unenforceable if they don't have the money appropriated for it, correct? So wouldn't our ruling in your favor on this have the exact same effect as the Court of Claims? No, not at all, because you can order a monetary payment. In Jorgensen v. Blagojevich, for a constitutional violation, and this is a constitutional violation, the court ordered the controller to pay. And the controller had to pay because it was authorized by the order of the court, which is all that we need under the Controller Act. So you can order monetary relief. And in Senn Park v. Miller, the court entered an injunction requiring the Department of Public Aid to pay money, prospectively, under a cost-of-living formula. That was specific performance. And what we're asking for here, and this is something that the Court of Claims can't give, is specific performance of the contract. These contracts haven't expired. They're often late in payment. All we're asking for in the court below is an order of specific performance. Come up to date on the payments. But it's really a contract action at bottom, isn't it? Well, of course it's a contract action because they're impairing the obligation of contracts. But it's also all true. Every impairment of a contract claim is a contract that's founded on contract. But if it were true that the State statute prohibits you focus and tell us the difference between breaching the contract and impairing it. Of course. First of all, in the ultra-virus claim, we pointed out that the governor is acting ultra-virus, exceeding the powers of his office by doing it. Also, it's really a kind of unfair trade practice, or the equivalent of it. It's an inconscionable act. It's not just a simple breach of contract. But in the impairment of contract claim, any time that there is a legislative act that renders payment of contracts less secure in some sort of systematic way, either because there's no legal remedy or there's no budget, there's a legislative act, a breakdown of the government that makes it impossible for the law of contracts to operate in a normal way, then there's an impairment of contract. And it's not just the fact that they're late paying $20 for a pair of screwdrivers. It's the fact that there's no budget. There's no budget. There's no anything going on in the state. We're in a crisis. And there's no remedy in the court of claims because they are only going to pay if there is a budget and there isn't any. So that, and on top of it, you have the General Assembly and the governor, and in our view this took a lot of nerve, passing the stopgap bill, which is we'll keep you alive just a little bit, but keep inflicting the pain on you. That is an impairment of the contracts on their face because they're effectively saying you're going to get so much appropriation, no more, and we don't care about this in the contract itself. Even though we, the General Assembly, are accepting the benefits of these contracts, we're accepting the performance, we think the contracts are legitimate, we just want to rewrite them. That's an impairment of contract. Well, if there's nothing further you want to add at this point, we're going to allow you some time for rebuttal. Is there anything further you want to add? Well, thank you for listening to me. I hope I wasn't being too emotional. No. But this is a very serious situation. Of course it is. And there are very vulnerable people who are suffering right now. Thank you. All right. Thank you. Counsel? May it please the Court, Assistant Attorney General Richard Huzdak for the defendants' apologies in this case, and I urge the Court to affirm the Circuit Court's dismissal of this action. There are multiple grounds that justify that dismissal. Sovereign immunity, the controlling significance of the appropriations clause, and finally, the plaintiff's attempt to characterize what are essentially breach of contract claims as claims for unconstitutional altruist conduct by the defendant. Mr. Huzdak, do you agree that the Governor's actions in continuing the contracts without taking the specific action of vetoing any appropriations for it did impair the contracts and therefore took it out of the exemption of sovereign immunity? No, we disagree with that proposition. Well, I was hoping you were going to say that. I think there are two interrelated issues. One is what was the status of those contracts after the Governor first vetoed the original appropriation that would have paid for many of the services provided? And the second is whether the Governor's veto can constitute a legislative enactment that brings it within the impairment of contract clause. The plaintiffs have, I think, attempted to obscure the difference between a Why don't you tell us? Our Constitution follows the U.S. Constitution under the contracts clause. Illinois Supreme Court precedent is absolutely clear, and U.S. Supreme Court precedent is likewise equally clear that an impairment of a contract is a legislative enactment after a contract is formed that changes the operative existing remedies for that contract. The stopgap budget did not do that, nor did the Governor's veto of the earlier appropriations. So I think a good way to illustrate the distinction here is to think about outstanding state bonds. Those are existing obligations of the state. They're subject to whatever legal remedies may apply to them. And if the state legislature were to pass a law saying we're reducing the That's a law impairing the obligation of contracts. And the remedy for that law is to invalidate it and to enjoin its enforcement. The remedy is not now to order payment to the bondholders, which would be the relief granted in a claim for a breach of contract. So there's a huge difference between what is an impairment of contract and a breach. The remedies are fundamentally different, and the remedy for an impairment of unlawful enactment by the legislature. But in addition to their request for payment, they've also asked for equitable relief in the form of an injunction, haven't they? Well, what they're asking for is specific performance of a contract. And Illinois precedent is absolutely clear that that doesn't get you out of sovereign immunity. And a claim for enforcement of a contract is not a claim challenging the validity of a law under the Contracts Clause. Otherwise, every breach of contract claim against the government would be in federal court. But the federal courts in the Illinois Supreme Court have made it clear that that is not what a breach of contract claim against the government makes it. It doesn't make it a constitutional violation. Well, is there something untoward about the idea that the state has entered into these contracts, then the legislature appropriates a certain amount of money for various things, and then the person who entered into the contract vetoes all of the appropriations so that the contracting party can't get paid? Well, untoward may be a good characterization of it. I think there's an element of unfairness here. Unfairness. We do not dispute the hardships. Yes, you haven't disputed it. On the plaintiffs or their clients. On the other hand, those hardships don't justify departing from federal law regarding state finances, including sovereign immunity and the Appropriations Clause. And isn't it your position there's nothing unconstitutional in terms of the governor vetoing the appropriations that impact the contracts? He did it according to the terms of the Constitution, and the plaintiffs themselves have now conceded that they're not challenging the validity of those vetoes themselves. Or they're challenging, sorry. Is this case a difference in the sense also that the contracts themselves are contingent upon appropriations for payment? That's significant, and that reaffirms existing constitutional law and statutory law. In the recent decision in the State v. AFSCME case, the Supreme Court said that it is against public policy to order the payment of funds where they have not been appropriated by the legislature. The General Assembly has the exclusive power to make appropriations of public funds, and no other branch of government has that power. So I want to say first, just as a technical matter, many people have said that the plaintiffs should be paid. But nobody has said that it's undisputed that the amounts they claim are legally due under these contracts. The contingency in those contracts is significant. It essentially delimits the scope of the obligations under those contracts. And the relevance here is that the appropriations clause is a key part of the separation of powers among the different branches of state government. It essentially says that, and it's been around since the 17th century in England, because the king was running up debts and parliament finally said no. Nobody gets paid unless the parliament appropriates their funds. That was so successful that that was adopted as part of the U.S. Constitution and the Constitution of virtually every state. And it means, then, that you can't just go to the executive branch and say, based upon actions by executive branch officials, allowing us to continue services under a contract, entering into the contract. That alone cannot circumvent the appropriations clause, which makes the General Assembly, which is the branch of government most accountable to the voters, the one that decides what payments are authorized and shall be made out of public funds. What they're asking for is not only an end run around the sovereign immunity with respect to breach of contract claims, but giving the executive branch a blank check, which is the last thing the state needs to incur and get judicially enforceable obligations beyond the appropriations power of the General Assembly. Now, there's a hardship in this rule. There's no doubt about it. And that hardship has been recognized for hundreds of years. At some point, people say, well, I thought I was acting reasonably in relying upon the actions of the executive branch, entering into the contract, performing under the contract, in the hope and expectation that the legislature would appropriate funds for it. And that hardship is greatly mitigated by the fact that people are on notice of the law, which is they have no right to get paid unless the legislature appropriates funds for it. And here, the contract specifically put them on notice of that provision. It reaffirms the provision in the Constitution itself, and it reaffirms the provision that's in the Comptroller Act and in Section 30 of the Finance Act that says you don't get a right to be paid from state funds unless the legislature appropriates the necessary funds for that. Do you agree with counsel's argument that court claims couldn't provide any relief or would not provide any relief? Well, I will agree with him, and I think it's correct, that the Court of Claims has a policy of not issuing awards, which are recommendations to the legislature to appropriate funds for those awards, where there has not been an appropriation. I think that's correct. That said, that doesn't mean that the unavailability of relief in the Court of Claims either means that this case falls outside of sovereign immunity or that it constitutes an unconstitutional impairment of contract. And there is no case, really, that says that. That says... But you just recited for us that taking the simple fact that they will not receive an award doesn't mean that that is a basis to... Avoid sovereign immunity. Yes. Yes, that's correct. And I think there's a case that says the mere fact that you can't get relief in the Court of Claims doesn't mean that a sovereign immunity doesn't apply. And that thinking or that reasoning would apply just as well to the appropriations clause. But there's also, I think, a false choice here. The plaintiffs have said that these contracts have been validated and accepted by the General Assembly when they enacted the stock gap budget. Well, they were always valid. There's no doubt that these were legally valid contracts, just like any contract with a state that's even subject to sovereign immunity. It's a valid contract, but it doesn't mean that it's enforceable in court. And the terms of the contract and the scope of the allegations on the contract is then provided by the degree of appropriations that the legislature makes. The plaintiffs essentially want to sort of have it both ways. They're saying that after the governor vetoed the original appropriation bill, that it was ultra-various for him to continue to allow the plaintiffs to provide services under those contracts. And I guess the question is, if that's true, then how come they demand to be paid for providing services that it was ultra-various for the governor to allow them to provide? They're really actually quite happy that they were allowed to do so instead of these contracts being terminated because when the stopgap budget was passed and provided them, as they say in their reply brief, with payment for almost all but not all of the amounts they claimed, that enabled them to say those services were not for naught. If there had been a termination, they would have not been able to continue to provide services, nor would they have been paid for those services. But the mere fact that they did continue doesn't create an enforceable contractual obligation on the state without appropriations. And the relief for anything that they've characterized as ultra-various, I want to be clear, under sovereign immunity, is not run to court and get a money judgment. The relief that they're asking for, or that would be appropriate under the officer's suit exception for ultra-various conduct, is an injunction preventing conduct that's in violation of the constitutional and statutory duty. So if this court were to say the governor is no longer allowed to permit service providers to perform under the contracts until appropriations have been granted, then that type of injunctive relief would be permissible under the Ultra-Various Act. I'm not urging the court to enter that. No, of course not. And I think there's some separation of power issues with that. Wouldn't you agree? Absolutely there are. What about Lataru and the Senn Park Nursing? How do you distinguish those cases? They both fall within the officer's suit exception because the relief that was granted in both of those was prospective injunctive relief against unlawful conduct or unconstitutional conduct. And in Senn Park, what was the conduct again? The conduct was that the director of the agency was refusing to comply with a non-discretionary mandatory statute that prescribed the manner for providing payments for certain services. And the court said, you've got to follow that statute. If this were a mandamus action, there would be no doubt that you would be ordered to do what the statute provides. And sovereign immunity doesn't allow you to act outside your authority by violating that clear mandatory obligation. Other than the Blagojevich case, are there any other cases where there was this request that payments be made and it was held that the actions were ultra-various? Not that I'm aware of. And there are plenty of cases that say a prayer for specific performance or declaratory relief does not get you outside of sovereign immunity when the underlying basis for your claim is a breach of contract. Ultimately, I mean, they have made resourceful claims. And I understand the difficult circumstances that may have led them to bring such sort of creative legal theories. But they're trying to dress in constitutional garb what is essentially a breach of contract claim. And it's like trying to spin straw into gold. At some point, it doesn't change the fundamental aspect of their claim where the only relief they're seeking is an order by the court that they be paid out of unappropriated state funds for prior contracts and prior services that they have provided. And that is unequivocally and categorically foreclosed by the sovereign immunity and by the appropriations clause. Both of those are sufficient. I can address further the merits of all their particular claims. I do want to make clear that the officer's suit exception isn't a cause of action. It's an exception to sovereign immunity. And if you want to challenge ultra-various conduct, you can do so by, if you have standing, to seek an injunction against it. And in some circumstances, that injunctive relief does fall within the officer's suit exception to sovereign immunity. But the relief they're seeking here, essentially a money judgment against the state out of unappropriated state funds, can't possibly fall within the officer's suit exception. I would point out that they've tried to sort of reinterpret the subject to appropriations clause in their contract so that that first sentence, which unequivocally says, this contract is contingent on and subject to available funds, which includes appropriations, doesn't really mean anything. It's only the trigger for the right to terminate. It has separate significance. It means what it says read in isolation. The contract is subject to available funds. If they're not available funds, that contingency isn't satisfied, and the obligation is not to do an enforceable under governing law. The defendants are not happy with this current situation. For contracts such as this with the contingency subject to appropriations, that provision, has that been routinely used over the years by the State of Illinois regarding these types of contracts that we're talking about today? It is, and our brief includes a reference to attorney general opinions from the 1970s that say that those provisions are routinely used, and they're used to reaffirm notice to the other parties that based upon the separation of powers of government and the constitutional structure for state finance and authorizing what's necessary to authorize funding, that it puts those parties on notice that they are subject to appropriations. And that's one of the difficulties of dealing with state government, which is not like dealing with a private party. If you had a ship moored at the dock that says, you know, mooring all vendors, the captain may not authorize payments to any vendors of goods or services without approval by the shareholder's finance committee. And then somebody says, well, I talked to the captain, I talked to his crew, I provided the services, I provided these goods. At some point you can't get around that. You can't just deal with the executive branch and then later say, that's a reason to disregard the fundamental constitutional separation of powers that makes the legislature the one that is responsible for authorizing payments to parties for contractual services or otherwise. But at the same time, has there ever been a pattern or situation in which even though these contingency provisions were available, you had a situation where the executive branch of the government was entering into contracts and then basically vetoing the appropriations when they came upon that desk? I think there are plenty of examples in which the... Nothing in the case law. I'd have to look, but I think there are situations in which the chief executive here, the governor, has vetoed appropriations bills and services have been provided and then later appropriations as hoped for were either granted or not granted. And in this case, remember the stopgap budget bill gave the plaintiffs most of what they wanted. And it essentially, you know, we can try and spin and characterize this whole budget impasse political football game that's been going on and they say that the stopgap bill was really intended to keep these service agencies hostage. Just the opposite. I think it was an attempt to try and provide them much of the payments that they hoped for. It's a difficult situation. The current budget impasse in this state, I believe, is unprecedented and has created great hardships for many people. The difficulty here is that although this is a hard case, it cannot possibly justify disregarding set of law with respect to the state sovereignty and the appropriations clause. And it certainly does not justify saying that you can go to the executive branch and get a judicially enforceable right to payment for contractual services. If that's the case, then the executive branch now has a blank check. The appropriations clause is a dead letter. And the Supreme Court just last year said that's not the case. Only the General Assembly has the authority to appropriate state funds. No other branch of government has that power. So that precedence is controlling here. And it makes it clear that whether services were provided or not, the Constitution provides the answer to this difficult question. And however much sympathy we have for the plaintiffs in these circumstances, it does not justify circumventing, sovereignly, or disregarding the clear command of the appropriations clause in the Illinois Constitution. The courts are not the place to try to get them paid in these circumstances. The responsibility for appropriating funds belongs in a different branch of government. Lest the Court has other questions, I urge the courts to affirm the circuit court's judgment. Thank you. Thank you. Mr. Gagin. Mr. Gagin. Would we be appropriating funds if we were to reverse the dismissal in this case? No more than the Supreme Court did in Jorgensen v. Blagojevich, or in the Hamer case, or in any case, really, where the state has violated the Constitution or acted outside of its executive powers. In Senn Park, the state, or the court, required the Department of Public Aid to pay money prospectively when their contracts came in. We're asking for a specific performance order to require the state to submit the vouchers over to the controller and have them authorized by payment by order of this Court. It doesn't require just an appropriation for the controller to issue payment to the plaintiffs. For example, it is now paying billions of dollars to state employees without an appropriation. You cited an unpublished decision in your brief. Did you not? Pardon? Yes, we did. What part of the rule allows that? What part of the rule? The court's equitable power to remedy constitutional violations. I'm talking about citing the unpublished decision. I mean, we're aware of it. Oh, I'm just talking about it as a matter of fact. I'm not trying to cite it as authority, but that's what's going on right now. Yes. And it's very interesting and important to emphasize that the governor, who has come forward and says, oh, I'm just protecting the power of the General Assembly. Remember, the General Assembly has tried twice to appropriate the money for these contracts. The governor has blocked it, and the governor comes before this Court and says to all of you, oh, I'm just here to protect the power of the General Assembly, which the governor, by his veto, has repeatedly frustrated over and over from funding these contracts. That's a huge difference. The Supreme Court decision last year, and this governor is not entitled to use his veto or the Article 8 defense or the claim that he's protecting the powers of the General Assembly, the institutional powers of the General Assembly, which is what Article 8 refers to. It doesn't talk about the governor's power, the General Assembly's power, when he has blocked the General Assembly from doing what it is supposed to do and doing what it has tried to do. I wanted to emphasize one thing about the Orr argument. They concede that there is no remedy in the Court of Claims, and that is the classic impairment situation. We cited the Seventh Circuit's case in Horvitz in our briefs, where Judge Posner is quoting Justice Holmes. Here's what the Seventh Circuit says. The cases relating to impairment differentiate between a measure that leaves diplomacy with a remedy in damages and one that extinguishes the remedy. In Holmes's, Oliver Wendell Holmes's vivid formulation, I think this is from the path of the law, the obligation by a contract is an obligation to perform or to pay damages for non-performance. And if the second alternative remains, the obligation created by the contract is not impaired. But they have said that the second alternative is not available. But do you agree with counsel's characterization that impairment is truly when the terms are changed as opposed to simply not being paid, or are you going to acquaint, and if you do, that's fine. Are you acquainting not being able to get paid because of the lack of appropriations to changing the terms of the contract, which actually said it was based on the ability to be appropriated? Of course. Yes. This is an impairment. I mean, the effect of passing the Seventh Circuit. Simply not getting paid? Well, it is an impairment. Here, canceling the obligation to pay, that's why they started in the U.S. Constitution, because they passed, certain states passed laws saying a private individual doesn't have to pay anymore. Here, they're saying we're going to pay you when it's appropriated, as your contract specifies. But it will never be appropriated. It hasn't been appropriated before. We're at the end of the fiscal year. You have to predict the future, aren't you? Well, three or four weeks. That's correct. But it's still an impairment of contract. And we should emphasize the fact that the contracts are supposed to be paid on a timely basis. And that is — But she does try to say that they extinguish the payment. Here, we won't do it. Well, I think it will be extinguished, and it has been extinguished for fiscal year 2016. But hasn't there been an ongoing effort to pay? And, in fact, most of the obligations as far as the money owed has been? For fiscal 17 — for fiscal 16, most of the money has been paid. But, you know, this is — we — this is in the exception for the mootness doctrine, because it's recurring over and over. There is no authority, no spending authority, to pay us a single dime for anything in calendar year 2017. So for half of the fiscal 2017, the second half, we're going to get nothing. And for the first half, there's been some payments for some providers in some small amounts, but there have been terrible losses. And the fact that that money came in after 12 months where no one was paid at all, it's not a trivial thing. There was staff laid off. We lost clients. Programs were cut. And when you shut down a senior assisted living facility because there was no money, it's not so easy to start it up again. So it's just not, well, no problem. You know, the money will come in in 14 or 15 months. Don't worry about it. It's a huge problem for these organizations, and it puts them in real financial peril. I wanted to stress one thing that I think is really important, which is — who is here before this court saying, oh, I've got to defend the General Assembly and the appropriation power. His lawyer in the court of St. Clair was telling the court just recently that the governor opposes lifting the injunction requiring him to pay state employees without an appropriation. I oppose it. Here, he's saying it's fine for me to keep paying them without an appropriation. Here, they're saying, oh, we can't pay them without an appropriation. I mean, that's just arbitrary and capricious by any standard, and it's unacceptable. And the attorney general's position, which is different from the governor's in the court of St. Clair case, is that, well, the state can't operate this way without an appropriation. It's just wrong. We can conduct public business this way without an appropriation. But here before this court, they're saying, oh, it's fine. We can conduct public business without an appropriation. You know, they are supposed to represent the people of Illinois, and while we may not represent the people of Illinois, we represent the people who serve and take care of the most vulnerable people in Illinois. And what is happening here is a violation of equal protection. It's an ultra-violence act because the governor has no right to continue these contracts when he's vetoed the funding of them. And if you look at Section 4.1, they say, oh, it's all contingent. They have control over that condition, and they're using it to frustrate the performance of these contracts, for which they know that there is now going to be no remedy for wrong payment in the court of claims. We respectfully submit that Justice Oliver Wendell Holmes would never commit this. And this is a kind of lawless, extra-constitutional breakdown of government that this court could turn aside from and say, look, it's none of our business. But it is your business. This is a matter of simple justice. Everyone agrees these contracts should be paid, and there is a willful scheme afoot to make these plaintiffs political hostages for something that is not their fault. Are there no further questions? Thank you, Mr. Gating. All right. I want to tell the attorneys and parties that the case is obviously a very complicated one. You have both and all of the lawyers ably argued the case in the briefs and here today. And we will take this case under advisement. And thank you for your comments today. Court is adjourned.